**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

JACOBUS C. RASSER,

Plaintiff,

-vs-

GREEN MOUNTAIN COFFEE ROASTERS, INC.

and

KEURIG, INCORPORATED,

Defendants.

C.A. No. ____________________

**TRIAL BY JURY DEMANDED**

# COMPLAINT

1. This is a *qui tam* action for false patent marking pursuant to 35 U.S.C. § 292.

2. Unlike recently publicized false patent marking actions based upon expired patents, this action is particularly notable because:

- it involves patents with significant remaining periods of exclusivity;
- it involves multiple patents;
- it involves a pattern of falsity that has existed for years;
- it involves multiple public admissions by Defendants that its patents do not cover the products bearing the patent markings;
- it involves false public statements by Defendants to the financial community and the investing public regarding its patent markings;
- it involves sales by Defendants of billions of product units with false patent marking;
- it involves Defendants earning hundreds of millions of dollars from products that are falsely marked;
- it involves Defendants earning tens of millions of dollars in patent licensing revenue despite false patent marking; and, as a result,
- it involves an extraordinary fine against Defendants, without even considering the maximum penalty provided by law of $500 per falsely marked article, to punish them for their intent to deceive the public.

## THE PARTIES

3. Plaintiff Jacobus C. Rasser ("Rasser") is a citizen of the United States residing at 105 Paseo de la Playa #B, Redondo Beach, California.

4. Defendant Green Mountain Coffee Roasters, Inc. ("Green Mountain") is a Delaware corporation with a place of business at 33 Coffee Lane, Waterbury, Vermont.

5. Defendant Keurig, Incorporated ("Keurig" or collectively with Green Mountain as "Defendants") is a Delaware corporation with a place of business at 55 Walkers Brook Drive, Reading, Massachusetts.

6. Keurig is a 100% owned subsidiary of Green Mountain.

## JURISDICTION AND VENUE

7. The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

8. Venue lies in this District pursuant to 28 U.S.C. §§ 1391, 1395 and 1400.

## COUNT ONE

## FACTUAL BACKGROUND

9. Rasser hereby incorporates by reference all of the above allegations.

10. Keurig is the U.S. market leader in the at-home, single-cup coffee brewing business and makes, distributes and sells a single-serve coffee capsule known as the "K-Cup."

11. Defendants have sold billions of K-Cups and have generated hundreds of millions of dollars from the sale of K-Cups.

12. Keurig is the owner of United States Patent No. 5,840,189 ("the '189 patent"), attached hereto as Exhibit A.

13. Keurig is the owner of United States Patent No. 5,325,765 ("the '765 patent"), attached hereto as Exhibit B.

14. Keurig is the owner of United States Patent No. 6,079,315 ("the '315 patent"), attached hereto as Exhibit C.

15. Keurig is the owner of United States Patent No. 6,082,247 ("the '247 patent"), attached hereto as Exhibit D.

16. Keurig is the owner of U.S. Patent Application Serial No. 10/658,925 to Karanikos, et al ("the '925 application").

17. Green Mountain's recent 10-K filing with the U.S. Securities and Exchange Commission ("SEC") stated: "The Company holds 33 U.S. patents and 73 international patents related to our Keurig brewing and portion pack technology. Of these, 86 are utility patents and 20 are design patents. We view these patents as very valuable but do not view any single patent as critical to the Company's success. We own patents that cover significant aspects of our products and certain patents of ours will expire in the future. The two principal patents associated with our current generation K-Cup portion packs will expire in 2012, and we have pending patent applications associated with this technology which, if ultimately issued as patents, would have expiration dates extending to 2023. Our agreements with our roasters are more than simple patent licenses. Roasters with agreements with the Company have access to and benefit from Keurig's technology and distribution network and we believe these benefits will help us to maintain royalty revenue irrespective of our patent status."

18. The "two principal patents" referred to by Green Mountain in paragraph 17 above are the '189 and '765 patents.

19. One of the "pending patent applications" referred to by Green Mountain in paragraph 17 above is the '925 application.

20. Senior employees of Defendants are significantly involved in Defendants' patent matters and have personal knowledge of what is covered and what is not covered by Defendants' patents and patent applications. John E. Sylvan and Peter B. Dragone are the named inventors on the '189 and '765 patents. Keurig was founded in 1990 by Dragone and Sylvan.

21. Basil Karanikos is Keurig's Vice President of Packaging Engineering. Karanikos is a named inventor on the '925 application and has personal knowledge of what is covered by and what is not covered by the '925 application and the '189 and '765 patents.

22. Defendants sell packages containing K-Cups which packages bear the following marking: "Covered by U.S. Patent Numbers 5,325,765 and 5,840,189 and other U.S. and foreign patents pending."

23. Defendants also sell packages which are marked with the '315 patent and the '247 patent.

24. Defendants have licensed patents to others, including without limitation, the '189 and '765 patents. Defendants have generated tens of millions of dollars from licenses which include rights to the '189 and '765 patents. Defendants require licensees of the '189 and '765 patents to mark those patents. The '189 and '765 patents have substantial value to Defendants. The '189 and '765 patents were used by Defendants in security interest transactions with Bank of America.

**FALSITY OF PATENT MARKING**

25. Defendants' marking of the '189 and '765 patents is false in that, among other things, Defendants changed the K-Cup such that it is not presently covered by the '189 and '765 patents.

26. Keurig cited, among other things, the '189 and '765 patents as prior art in the '925 application. The '925 application was rejected by the United States Patent and Trademark Office ("PTO") because, among other reasons, it was unpatentable in light of the '765 patent. Keurig filed an action in the United States District Court for the District of Columbia captioned *Keurig, Inc. v. Hon. David Kappos*, Case No. 1:09-cv-02353 (the "DC Action"), to overturn the PTO rejection and have the '925 application issued as a patent. In the DC Action, Keurig stated that the innovative new K-Cup filter cartridge of the '925 application has been commercialized.

27. In the prosecution of the '925 application, Keurig stated that the innovative new K-Cup filter cartridge of the '925 application has been commercialized. Keurig has repeatedly argued in the PTO that the currently commercialized K-Cup filter cartridge of the '925 application is not covered by, among other things, the '189 and '765 patents.

28. Defendants have marked and continue to mark the '189 and '765 patents on packages which they have represented contain K-Cups with the technology of the '925 application and not the technology of the '189 and '765 patents.

29. Defendants' marking of the '765 patent is false in that, among other things, it is marked on packages that do not contain an "apparatus" as claimed in the '765 patent.

30. Defendants' marking of the '315 patent is false in that, among other things, it is marked on packages that do not contain a "chamber" or a "holder" as claimed in the '315 patent.

31. Defendants' marking of the '247 patent is false in that, among other things, it is marked on packages that do not contain an "apparatus" as claimed in the '247 patent.

32. The above instances of false marking are representative and not exhaustive.

**INTENT TO DECEIVE**

33. Defendants did not have, and could not have, a reasonable belief that its products were properly marked with the '765, '189, '315 and '247 patents. Defendants knew, or should have known, that its products were not properly marked with the '765, '189, '315 and '247 patents.

34. Defendants are patent-conscious and patent-sophisticated companies as reflected in, among other places, its filings in the SEC and PTO. For example, in a recent financial analyst call, the following question was posed to Green Mountain Chief Executive Officer Larry Blanford by Analyst Mark Astrachan: "And then, shifting to the patent expiration issue, you touch on it in your 10-K about two principal patents on K-Cups expiring in 2012. You're applying for a renewal of that patent. Could you just give us some broad strokes about how we should think about potential K-Cup patents going forward beyond 2012, 2013, just what your views are in terms of how you think about that going forward?"

35. In response to the question in the above paragraph, Green Mountain CEO Larry Blanford responded: "So, yes, we currently produce products under two patents that are listed, I believe, on all of our outer packaging sleeves that do run out in, I believe, September of 2012. But what we have said is that there are many aspects of our business that give us significant confidence beyond those patent expirations. Certainly, we have license agreements with our current roasters that extend well beyond that time. We have a suite of technology that includes patents on brewers and on packaging equipment. And, of

course, as we have indicated, we continue very aggressive development on portion packs. I think I referenced in the last quarter and then I referenced again earlier today, we have a new next-generation K-Cup technology coming that will allow us to deliver larger cup sizes or a stronger cup of coffee in 8 ounces. So that's important. Beyond all of that, as I think you are aware, we have other portion pack patents, one of which, I think, expires in 2023, if I'm not mistaken, which was, in fact, the subject of the earlier litigation with Kraft. And it certainly can also potentially play a role in bringing forward new consumer benefit and enhancing our patent protection."

36. Mr. Blanford's statements in the above paragraph about the "two patents" refer to the '189 and '765 patents, and those statements are false.

37. Defendants devote substantial financial resources each year to patents, including without limitation, research & development and procuring and maintaining patents. Defendants devote substantial personnel resources, including employees and contractors, each year to patents, including without limitation, research & development and procuring and maintaining patents.

38. Defendants' K-Cups are purchased by millions of consumers. Purchasers of Defendants' K-Cups do not have the patent sophistication of Defendants. Each individual K-Cup is a relatively inexpensive item. It is not realistic to expect consumers who purchase K-Cups to independently determine the accuracy or inaccuracy of Defendants' patent marking. It is realistic to expect consumers who purchase K-Cups to rely upon Defendants' patent marking.

39. Defendants intended to mark the '765, '189, '315 and '247 patents. Defendants intended that the public rely upon their marking of the '765, '189, '315 and '247 patents. Defendants had the opportunity and means to remove the false patent marking.

Defendants intended to deceive the public by, among other things, maintaining the false marking after the commercialization of the new K-Cup, maintaining the false marking despite their statements to the PTO, and maintaining the false marking despite their statements in the DC Action.

40. Defendants intended to deceive the public by, among other things, their statements to the SEC and to the financial and investing community.

41. Defendants' patent markings were intended to be seen by competitors and the public. Defendants' public statements about K-Cups, including without limitation, to the PTO, the SEC and financial analysts, were intended to reach competitors and the public. Defendants intended their statements in the PTO to be relied upon by the PTO. Defendants intended their statements to the SEC to be relied upon by the SEC. Defendants intended their statements in the DC Action to be relied upon by that Court. Defendants intended their statements to financial analysts to be relied upon by the public. Defendants intended to maintain their false patent marking in order to justify a high retail price for K-Cups. Defendants intended to maintain their false patent marking in order to justify a high royalty rate charged to its licensees for the K-Cups. Defendants intended to maintain their false patent marking in order to maintain an advantageous market and financial positions compared to their competitors.

42. Each instance of false marking identified in this Complaint is likely to, or at least has the potential to, discourage or deter persons and companies from commercializing competing products, thereby causing harm to the public.

**FEDERAL PATENT MARKING**

43. The patent marking statute, 35 U.S.C. § 287(a), and the false patent marking statute, 35 U.S.C. § 292, exist to insure that the public has accurate information on the existence of patent rights in articles.

44. As expressed in *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1998), the purpose of the patent marking statute is to, among other things, help to avoid innocent infringement, encourage patentees to give notice to the public that the article is patented, and aid the public to identify whether an article is patented.

45. False marking of unpatented articles as "patented" is injurious to the public interest, in at least the following ways: (a) acts of false marking deter innovation and stifle competition in the marketplace; (b) false marks may deter scientific research when an inventor sees a mark and decides to forgo continued research to avoid possible infringement; (c) false marking can cause unnecessary investment in design-around activities and/or costs incurred to analyze the validity or enforceability of a patent whose number has been marked upon a product with which a competitor would like to compete.

46. False patent marking can inflate the perceived value of a patentee's shares of stock.

47. A consumer seeing an article marked as "patented" is likely to infer the article possesses design or utilitarian features that are unique and exclusive to such article, and not available in substitute articles from other producers, thus inducing consumer demand for the marked article.

48. The United States Supreme Court has determined that patents, by their very nature, are affected with a public interest. *Precision Instrument Mfg. Co. v. Auto. Maint.*

*Mach.*, 324 U.S. 806, 816 (1945). The PTO has likewise determined that patents, by their very nature, are affected with a public interest. 37 C.F.R. § 1.56(a).

49. Due to the public's interest in the patent system, Congress has empowered "any person" to file a false marking action in District Court under 35 U.S.C. § 292, whether or not the person acting is involved in a substantial controversy with the patentee or has adverse legal interests to the patentee or has sustained an injury-in-fact.

50. False patent marking is an impediment to basic federal policy in that: "An unpatented article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so." *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964); *Compco Corp. v. Day-Brite Lighting*, 376 U.S. 234 (1964). "[F]ederal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent," *Lear, Inc. v. Adkins*, 395 U.S. 653, 668 (1969), and "[i]n general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying," *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 523 U.S. 23, 29 (2001).

51. Defendants have been unjustly enriched by virtue of their false marking including, without limitation, their collection of sales revenue and profit from falsely marked products, their collection of licensing revenue, and their use of these patents in connection with security interests and with the financial and investment communities.

52. This unjust enrichment has been at the expense of the public and competitors.

53. Defendants have violated 35 U.S.C. § 292(a) by placing patent markings on unpatented articles for the purpose of deceiving the public.

54. Rasser, on his own behalf and on behalf of the United States, seeks an award of monetary damages of not more than $500 per article for each of Defendants' violations

of 35 U.S.C. § 292(a), one-half of which shall be paid to the United States pursuant to 35 U.S.C. § 292(b).

55. Defendants' false patent marking is injurious to the public and requires that Defendants be enjoined from further acts of false marking.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Rasser demands entry of judgment against Defendants Green Mountain and Keurig granting relief as follows:

A. A determination that Defendants have violated 35 U.S.C. § 292 by falsely marking products for the purpose of deceiving the public;

B. An order fining Defendants for false marking of its products, said fine in an amount not to exceed $500 per article, said fine representing at a minimum a complete disgorgement by Defendants of all ill-gotten gains and an amount which is reasonable in light of Defendants' total revenue, gross profit and licensing revenue from the sale of said falsely marked goods, with half of the fine going to the United States and the other half going to Rasser, along with pre-judgment and post-judgment interest until paid;

C. A determination that this case is "exceptional" under 35 U.S.C. § 285 such that Rasser is entitled to an award of his attorneys' fees;

D. An award in favor of Rasser and against Defendants for the costs incurred by Rasser in bringing and maintaining this action;

E. An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, contractors, suppliers and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by

personal service or otherwise, from committing new acts of false patent marking and to cease all existing acts of false patent marking.

F. Such other relief as may be just and equitable and as deemed by the Court to be necessary and appropriate.

**JURY DEMAND**

Rasser hereby demands a trial by jury of all issues so triable.

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
RICHARDS, LAYTON & FINGER
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
302-651-7509
302-651-7701
cottrell@rlf.com
rawnsley@rlf.com
*Attorneys for Plaintiff*

OF COUNSEL:

Patrick D. Lane, Esq.
DINSMORE & SHOHL, LLP
1900 Chemed Center
255 E. Fifth Street
Cincinnati, Ohio 45202
513-977-8200
513-977-8141
pat.lane@dinslaw.com

Date: Nov. 23, 2010